## TEXAS & N. O. R. CO. v. CAMMACK.*
### (No. 3130.)

(Court of Civil Appeals of Texas. Texarkana. Jan. 28, 1926.)

**1. Master and servant ⬤➾286(30)—Negligence as to brakeman thrown between cars by unusual jerk held for jury (federal Employers' Liability Act [U. S. Comp. St. §§ 8657–8665]).**

In brakeman's action for injuries under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) when falling between cars from unusual jerk of train, question of railroad's negligence *held* for jury.

**2. Master and servant ⬤➾217(29) — Employee does not assume risk of coemployee's negligence *unless known*.**

Employee does not assume risk of any negligent act of coemployee unless he becomes aware of it, or unless negligent act is so plainly observable before injury results that he must be presumed to have known it.

**3. Trial ⬤➾350(6).**

In brakeman's action under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries when falling between cars, issue of assumption of risk *held* properly submitted, even though railroad was engaged in interstate commerce.

**4. Damages ⬤➾50.**

Mental anguish and physical suffering, present and future, resulting from injuries, are compensable.

Appeal from District Court, Cherokee County; C. A. Hodges, Judge.

Action by J. J. Cammack against the Texas & New Orleans Railroad Company. Judgment for plaintiff, and defendant appeals. Affirmed.

The action is by appellee for damages for personal injuries. The appellee was a member of the train crew, in the capacity of head brakeman; and while passing from one car to another in the regular course of work was thrown between the cars as the immediate result of an unusual, sharp pull of the train, and the moving train passed over him, severely and permanently injuring him. The petition alleged as grounds of negligence:

"(1) The failure on the part of the servants and employees of defendant charged with the operation of the engine to apply and distribute the sand to the rails for the purpose of preventing the wheels of the engine from slipping;

"(2) The act of the servants and employees of the defendant charged with the operation of the engine in suddenly and instantly, after the wheels of the engine had slipped, causing said engine to move forward with a sudden, violent, and extraordinary lurch and jerk as he was passing between said cars; or

"(3) If plaintiff be mistaken in the allegation that the wheels of the engine slipped for the

reason aforesaid, then there was negligence on the part of the servants and employees of defendant charged with the operation of the engine in the reckless and unusual handling of said engine in such manner as to cause the same to suddenly and violently lurch and jerk forward while the plaintiff was in the act of passing from one car to another, thereby jerking his support and hold loose from said cars and throwing him down between the same."

The defendant specially pleaded contributory negligence, in that:

"(1) The plaintiff voluntarily left the caboose without any reason for so doing, or without performing any duty or service for the defendant, or without any necessity for him going over the gondola cars in the nighttime; and that in doing so, or in attempting to leave the caboose to go to some other portion of the train, knowing the condition of the rails and that the engine had previously been slipping, and knowing the condition and construction of the cars, and knowing that the steps and handholds and platforms were wet and slippery, the plaintiff was guilty of contributory negligence, which contributory negligence was the proximate cause of his injuries, if any;

"(2) That the plaintiff in trying to pass from car to car, knowing the condition of the cars and distance between same, attempted to swing his body from car to car without first catching hold of the car in front of him; that the way he attempted to cross was dangerous to plaintiff and seemed so to be to him, and that plaintiff did not exercise ordinary care in passing from car to car."

The defendant further pleaded at length to the effect that it was engaged in interstate commerce, and that under the federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) the appellee assumed the risk of the injuries received in the manner and way alleged.

At the time in question, and prior thereto, the appellant company operated a train equipped for the purpose of hauling gravel from its side track at Mabank, Tex., to Jacksonville, Tex., a distance of 57 miles. The cars were specially constructed for hauling sand and gravel. They were open cars, with the sides and ends of steel, about 5 feet deep and 40 feet long. On the side of each car, near the end, were an iron step or stirrup and several handholds, constituting a ladder, provided for the use of employees in the operation of the car in mounting the same and in passing from one car to the other. A caboose and 20 of these cars loaded with gravel were usually put in the train. At the time in question a caboose and 18 cars loaded with gravel constituted the train. The engine that usually pulled the train was a large and heavy one of the "800 type," specially built for drawing heavy tonnage. That engine pulled the train in this instance. It appears that the appellant was ballasting its particular branch line of road from Dal-

⬤➾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused April 20, 1926.

las to Beaumont. This branch line connected with the main line, running from Houston, Tex., to New Orleans, La. The passenger trains of appellant carry mail, express, and passengers both inside the state of Texas and from this state to other states and beyond. Appellant is engaged in both intrastate and interstate commerce, and was prior to this injury, and such commerce was handled over all of its tracks and roadbed on its different trains. The gravel train did not handle shipments of any kind, and was used to haul gravel only. A contractor was furnishing the gravel to appellant, and he delivered it loaded in appellant's cars on the side track at Mabank. The gravel was mined and loaded at a point about 31 miles from Mabank. The appellant transported the loaded cars from Mabank to Jacksonville; and from Jacksonville the cars were transported to the different places on the branch line needing the same in the course of the work of ballasting, to be ultimately unloaded and spread on the roadbed by the section men. The train crew of which appellee was a member had nothing further to do with the transportation of the gravel after the train reached Jacksonville. An entirely different crew later transported the gravel for distribution on the line being ballasted. At the particular time in question, on April 8, the gravel train left Mabank for Jacksonville about midnight. When the train reached a point a mile and a half of the station of Jacksonville, the appellee received the injuries sued for. He described the occurrence as follows:

"An accident happened to me during that run on the morning of April 8. The place where I got hurt was something near a mile and a half west of Jacksonville, and it occurred about 6:15 or 6:30 o'clock in the morning; it was after daylight. At the time I got hurt, I was going toward the head of the train from the caboose. In going from the caboose to the head end of the train, I had no other way to go than to pass over the cars, without getting off and outrunning the train. As a rule, my duties required me to be on the head end of that train, next to the engine. I was the head brakeman. Upon reaching the station of Jacksonville, my duty was to move the train in on the side track or the yards, and to detach the engine from the cars. The head brakeman generally rides in the car next to the engine; the rear brakeman and the conductor usually ride in the caboose. I had been riding in the caboose for something like three or four miles—from Frye Gap Hill. That hill is the longest we have—nearly six miles long, upgrade. We usually had to double that hill with this gravel train. By doubling a hill, I mean when the train stalls in going up the grade you have to uncouple the train, and the engine then pulls a part of the train to the top of the grade and leaves the cars there, and then goes back and gets the other cars. At this time the engine stalled on that hill, and it was slipping downgrade. That was the reason I left the front end of the train and was in the caboose. I tried to cut the train in two parts, but it was so stretched out I couldn't pull the coupling pin. The engine had not completely stopped; it was barely moving. The conductor came from the caboose to where I was on the train and told me to cut the air and see if it could not be pulled. I was ten cars from the engine. After I cut the air, the conductor told me to 'highball' the engine. I did, and the engineer started off and made the hill. I then went in the caboose and stayed there until we reached the point where I was hurt. If I had not gone in the caboose after the engine began to move upgrade, I would have had to go over the cars from that point. It is part of my duty as head brakeman to go to different parts of the train as becomes necessary. When I left the caboose to go to the front end, my purpose was to be there to cut off the engine when we got into the yard at Jacksonville. That was part of my duty. In going from the caboose I made my way over the cars. I walked through the middle of the cars on the gravel, and when I got to the end of the car I got from the one to the other by the grabirons or handholds. Trainmen pass from one car to another by means of handholds. These handholds are of metal attached to the side of the car, about 16 inches long, and are ladderlike. We use the grabirons for our hands and feet both. As to what happened to me after I left the caboose, and as to how long it was after I left the caboose, I will say something like three or four minutes. As to how it occurred, I will state that the train jerked. At the time the train was jerked I was between the cars—going from one car to another. When the jerk came, I had gotten around on the end of the car on the grabirons and was putting my foot on the grabirons of the other car ahead. The grabirons of the car ahead did not run all the way up and down like the car I was on. The car ahead had two grabirons, and they were at the bottom. I would have to step on the grabirons of the car ahead with my foot and then make a swing of the body and catch the top of the car with my hand. When the jerk came, I was making this step. I had put my foot on the grabiron and was going to make the swing of my body to catch hold of the top of the car with my hand. If I had succeeded in completing the movement, I would have been on the car ahead with my foot in the grabirons and with my hand on top of the car. I had not succeeded in getting my hand on the top of the car beam, as I undertook to do, as the jerk of the train came before I had time to get the hold. When the jerk came, I fell on the track between the cars. I was under the cars. The first pair of trucks of the car passed over me, and that is the last I remember."

Continuing, he says:

"That jerk of the train was an unusually hard jerk. But for that unusual and hard jerk, there was no occasion for me to fall. It was a very violent, extraordinary hard jerk. I did what I did there in making that movement in the usual way that I have always done it. Other brakemen, as I have seen, do the same way in passing from one car to another, and with the same movements. There is no other available way to get from one car to the other except the way I did go. The train was making 10 or 12 miles an hour at the time the jerk occurred and I fell.

We were going upgrade at the time of the jerk, known as Sand Hill or Gum Creek Hill. It is a grade of about 1½ miles long. I had never known of an engine stalling or slipping down that hill. Suddenly applying steam to the engine would jerk the train. The more steam that was applied, the bigger the jerk. In the operation of freight trains there is more or less of rocks and jerks ordinarily. It was not that kind of a jerk that caused me to fall between the cars. I have been a brakeman on this particular road for about six years. I was acquainted with the road and different grades and curves and where they were. * * * When I fell, I fell instantly. I had no time to reflect. The grabiron was jerked from under my foot. The jerk just jerked the car from under my foot and let me down. It was not the jerk of the car that caused me to lose my balance and fall, but the jerk of the car jerked it out. * * * I did not hear the engine slipping any going up the grade. I did not hear or see it. From my experience I know it is bound to have been slipping, the drivewheels turning around rapidly, and steam was applied to the engine to start it moving. When the slippage begins, the engineer ordinarily starts or steams the engine before the cars run down and against the engine. That usually causes a jerk, taking up the slack."

### The conductor testified:

"The track was upgrade at the point where Mr. Cammack (appellee) got hurt. I do not remember ever having to double over that grade at that point. The first I knew of Mr. Cammack's having received an injury was when I felt the caboose bump as if running over something. I didn't know the cause, and looked and saw him lying in the middle of the track. I then pulled the air and stopped the train immediately, and went to him. His head was all cut up and the skin pulled back off his head, and his foot was mashed, and one of his hands was mashed and all curled up in front. We phoned for an ambulance, and it came at once and took him to the sanitarium at Jacksonville. * * * Mr. Cammack had just left the caboose a little while before I felt the bumping. He was going towards the head end of the train. In going towards the engine he had to go over the cars and climb from car to car. I felt a pretty hard jerk in the train after we had started up this hill. It was after he (appellee) left the caboose that I observed this jerk. I did not discover anything out of the ordinary that the engine was doing after I felt this jerk of the train—only that the engine was slipping, which means that the wheels of the engine were spinning on the rails. That was a little bit more than an ordinary jerk; it was more than we had been accustomed to on account of not being used to big engines. I suppose it was on account of being a big, stout engine. It was a pretty big jerk—a pretty good jolt. It couldn't have been very long after I felt that jerk and the engine slipping before I felt the caboose bumping and then discovered Mr. Cammack. I don't think we had gone over seven car lengths. The train was going about 10 miles an hour. Mr. Cammack had been riding in the caboose about 4 miles before he left it to go towards his place on the front end. He got in the caboose about 1½ miles west of Frye Gap. He would have to go to the front end of the train when he got to Jacksonville, because the rules required him to be there to perform the duties I have stated."

### Continuing, the conductor stated:

"It had been a slow rain up until about an hour, as well as I remember, before the accident. The rails were wet and damp. It was not raining when the accident happened. * * * Cars moving 10 miles an hour upgrade such as that was, if the wheels of the engine begin to spin on the rails and the engine is not pulling, my experience is that the momentum of the cars would have a tendency to shove them up against the engine, and when the engine didn't catch, to drop them back down the grade. When the rails are wet or damp an engine will slip or spin; it will under a heavy load. Mr. Cammack is an experienced brakeman, and I suppose he knew of these conditions of a train or engine slipping going upgrade when the rails are wet. Before we reached Frye Gap, we had a number of short upgrades. At that time the engine pulling the train would slip on the heavy grades. I felt the engine slipping at various times and at different places. He knew that the engine had been slipping by reason of the slippery and wet rails; he was head brakeman. That slipping of the engine was the same as an ordinary engine makes under similar circumstances, where they haven't a heavy load. Under the same conditions, any other engine would have slipped or slided over the grades. My experience is that, carrying heavy gravel cars, the engine will slip if you don't keep sand under them all the time. On a heavy grade the engineer works sand off and on before the wheels commence to slip. I don't know whether this engineer did that or not. * * * The slipping of the train that night seemed a little bit stronger than was the usual and ordinary slipping of engines all the time since I have been a conductor. It seemed so on account of that being a big engine and our not being used to it. It was jerking awfully bad, and I believe out of the ordinary. That engine was of the best approved type to be used with reference to slipping. They have a low wheel and are not bad about slipping, and are considered as the best engine they have. An engine pulling a heavy load upgrade will sometimes slip, regardless of whether or not sand is applied. * * * Prior to the time I felt the caboose going over him (Cammack), these jerks I had felt in the operation of the train were the ordinary jerks in the operation of a freight train. We generally get ordinary jerks on the freight train. On the Frye Gap Hill the jerks that night were out of the ordinary, harder than usual on account of the heavy train and heavy engine, I suppose, and the slack would just come right. They were extraordinary hard on Frye Gap Hill. But the jerks and jars when the plaintiff was injured were the ordinary jerks and jars you would experience in running a train. When the plaintiff was injured, the jerks and jars and slips that the engine made prior to the time the plaintiff was injured were the ordinary jerks and jars incident to the running of the freight train."

### The engineer testified:

"We apply sand when an engine begins to slip. In making Frye Gap Hill the engine slipped a number of times. Every time I applied sand it would catch and hold. We were going up the

hill a mile and a quarter from Jacksonville, and my engine slipped a time or two. I did not anticipate this engine would slip on this Jacksonville Hill, and I did not apply sand until it did begin to slip; I mean the first time it slipped. I know he (Cammack) got on the caboose, because I could see him get on it. The only way he could get on the front from the caboose was to go over the cars. I knew he would come over the train to be in his place at the head end of the train. * * * The engine slipped several times coming up Athens Hill and in going up Frye Gap Hill. On Frye Gap Hill my sand stopped working and I cleaned out my sand pipe. The water from the rain and dew had caused the pipe to clog up. I was applying my sand on the Jacksonville Hill before I began slipping. When it slipped I eased off on the throttle and then gave it more steam as soon as it quit slipping. It slipped in spite of my giving it sand. The first I knew any one was hurt was when the air went into the emergency. I then heard that Mr. Cammack had been hurt. I was going about 10 miles an hour at the time of the accident. I did not anticipate my engine slipping. As soon as it began slipping, then I applied the sand. The engine slipped on the sand, and I eased off the throttle, and just as soon as the engine stopped slipping I gave the engine more steam and started on again. It was not different from any other train operated under the same circumstances. It is impossible to operate a freight train with full tonnage without jerking a little; there are jerks all the time in the operation of the engine of the freight train—a fact known to all the crew of the train. * * * In operating this engine that night going over the various grades, I found that my engine was inclined to slip. That would result from the wet, slippery track. It had been raining that night, and the tracks were wet and slippery. It is a fact that I can't sand the rails so as to keep the wheels from slipping; I have seen them slip with sand working good—slipped on two streams of sand."

There is further testimony in behalf of the appellee, given by other witnesses, to the effect, as the jury would be authorized to say, that there was a violent and unusual jerk of the train, caused by the sudden forward movement of the engine by the engineer at the time when the appellee was passing between the cars, and that the engineer could have anticipated a slip of the wheels of the engine and could have applied sand to prevent the slipping, and if sand had been properly applied the engine wheels would not have slipped and the forward movement of the engine would not likely have resulted in a violent jerk.

There is further evidence in behalf of appellant to the effect, as the jury would be authorized to say, that at the time the engine slipped causing a jerk, which appellee claims caused him to fall, the engineer was applying the sand and was handling the engine as it would ordinarily be handled under the circumstances; that the jerk of the train at the time of injury was the usual and ordinary jerk in operating an engine going up-

grade with a heavy train, the engine wheels slipping on a wet track; that the engine was fully equipped with sand at the time; and that the engineer applied it.

The following special issues were submitted to and answered by the jury:

"Special Issue No. 1. Was the plaintiff caused to fall while passing between the cars as a result of an unusual and extraordinary jerk of the train? Yes.

"Special Issue No. 2. Was the employee of the defendant in charge of the engine guilty of 'negligence,' as that term has been herein defined, in causing such jerk of the train? Yes.

"Special Issue No. 3. Was such negligence a 'proximate cause,' as that term is herein defined, of plaintiff's injuries? Yes.

"Special Issue No. 4. Did the plaintiff 'assume the risk,' as that term has been herein defined, of such negligence, if any? No.

"Special Issue No. 5. Did the engineer fail to apply the sand as he was making the grade where plaintiff was injured before the wheels of the engine began to slip? Yes.

"Special Issue No. 6. Was the engineer guilty of 'negligence,' as that term has been herein defined, in failing to apply the sand on the occasion in question, before the engine began to slip? Yes.

"Special Issue No. 7. Was such negligence a proximate cause of the plaintiff's injuries? Yes.

"Special Issue No. 8. Was the plaintiff guilty of 'contributory negligence," as that term has been herein defined, in the method adopted, or in the manner of the movement made by him, while passing from one car to the other? No."

The further finding of the jury is as to the amount of damages. The findings of the jury, having evidence to support them, are by this court approved, and they are here adopted as the findings of fact.

Garrison & Watson and Baker, Botts, Parker & Garwood, all of Houston, and Guinn & Guinn, of Rusk, for appellant.

Woods, King & John, of Houston, and Norman, Shook & Gibson, of Rusk, for appellee.

LEVY, J. (after stating the facts as above). [1] The point first presented on appeal by appellant is to the effect that the evidence speaks unequivocally of the lack of any negligence in the operation of the engine upon which to found a legal liability to appellee for his injuries. It affirmatively and conclusively appears that the appellee was going from the caboose, over the cars, to the front end of the train in order to discharge the duties of head brakeman upon the arrival of the train at Jacksonville, which was a short distance away. The engineer had actual knowledge of appellee's riding in the caboose, and further knew, as he said, that—

"Cammack would have to go over the cars to get from the caboose to the head end for the purpose of uncoupling at Jacksonville. I knew he would come over the train to be in his place at the head of the train."

And it is an admitted fact that appellee fell between the moving cars as he was attempting to cross from one car to another. What caused him to fall? It can scarcely be doubted from the evidence that he was caused to fall by "a jerk" of the train at the very time he was attempting to cross over from the car he was on to the car immediately ahead. The "jerk" coming at the time it did prevented the appellee, as he says, from "getting my handhold on the top of the car, as I undertook to make it, because I didn't have time to make it, as the jerk of the train came before I had time to make it and get hold of it." And the circumstances tend to corroborate the statement made by the appellee. At that place and time a "jerk" of the train occurred, as shown by all the operatives of the train. At the time the heavily loaded train was going upgrade, the rails were wet, and the wheels of the engine suddenly began to slip, and the engineer started the engine forward with a quick motion. The "jerk" so caused was, according to the evidence, either the usual and ordinary pull of the engine occurring in the operation of the train under the circumstances, such as might reasonably have been anticipated by the train crew, or the pull of the engine caused by its being operated forward suddenly with quick, sharp force, not commonly occurring in the usual and ordinary operation of the train under the circumstances. Some of the witnesses, including appellee, described the "jerk" as "unusually hard," "a big jerk," and "more than an ordinary jerk." Appellee testified:

"That jerk of the train was an unusually hard jerk. But for that unusual and hard jerk there was no occasion for me to fall."

The brakeman testified that the jerk "was a severe jerk; it was a violent jerk." The conductor testified that—

The jerk "was a pretty big jerk, a pretty good jolt—a little bit more than an ordinary jerk on account of not being used to big engines. It was more than we had been accustomed to."

On the other hand, the engineer and other witnesses testified to the effect that the jerk "was but the usual and ordinary jerk occasioned by an engine slipping under like conditions." And the engineer further stated: "I sanded the rails before it (the engine) slipped, and I continued to sand it." There is evidence, however, tending to show a failure of the engineer to sand the rails before the engine wheels began to slip. Therefore, we conclude, after timely deliberations, that in the circumstances, it could not reasonably be said, as a matter of law, there is no evidence justifying the submission of the issue of negligence vel non to the jury. For if the fact be true that the appellee was immediately caused to fall between the cars by a pull of the engine with quick, sharp force

not in the usual and necessary operation of the train under the circumstances, or if the fact be true that the pull or jerk of the engine and cars could reasonably have been averted or lessened by the customary and timely application of sand to the rails by the operative of the engine, then there is ample room in the evidence to authorize the further finding of negligent operation of the train. The jury made the special findings that the appellee was caused to fall between the cars by a sudden, quick pull of the engine and cars, out of the usual and ordinary operation of the train, and that the engineer failed to promptly and timely apply sand. And there is evidence sufficient to justify their further findings that the acts mentioned constituted negligence proximately causing appellee's injury. Therefore the several propositions pertinent to the point are overruled.

[2, 3] It is next contended that there was failure to submit separately and distinctly the different issues of fact constituting contributory negligence and assumed risk. The court, in special issue No. 8, specially authorized a finding by the jury as to whether or not "the method or the manner of the movement made by him while passing from one car to the other" constituted contributory negligence on the part of the appellee. That issue was phrased in substantially the words of the appellant's answer. "Contributory negligence" was specially and correctly defined in the charge. The only issue of contributory negligence raised, even remotely so, by the evidence, was that submitted by the court, in the method adopted or in the manner of the movement made by the appellee while attempting to pass from one car to another at the time of his fall and injury. The appellee undertook to go from the one car to the car ahead in the way and manner usually and customarily done by brakemen, and there is no affirmative evidence nor circumstances going to show to the contrary The court left to the jury the decision of whether or not the appellee assumed the risk of the "negligence" of his coemployees operating the engine. The court specially informed the jury that the appellee assumed the risk of "negligence known to him, or when such negligence is so plainly discoverable as he must have known thereof." There can scarcely be a doubt from the evidence that the appellee fell instantly between the cars when the negligent jerk relied on occurred. He had no opportunity to know of the particular negligent act until it occurred. The rule is general and invariable that an employee does not assume the risk of any negligent act of a coemployee until he becomes aware of it, or unless the negligent act is so plainly observable before injury results that he must be presumed to have known it. And even if the appellant were engaged in interstate commerce, the court correctly submitted the issue of assumed risk,

if it could be said at all that such issue was raised by the evidence. Therefore all the propositions pertinent to these points are overruled.

We have carefully considered all the propositions relating to errors claimed to have been made during the trial, and we conclude that each of them should be overruled as not constituting reversible error.

[4] The last question, pertaining to the amount of the verdict, we have carried under consideration for some time. The amount is quite large, it is true, but the injury and loss to appellee is grave and serious too. The appellee was 30 years old, sound and healthy, and experienced in railroad work. He was in line of promotion and had served as extra conductor when needed. He was earning about $2,500 a year in his line of work. As the result of his injuries, he was in the hospital for many months and has been operated on twice since the injury as a result of the injury. His present bodily condition renders him practically helpless, and permanently so. One leg is gone and the remaining foot mashed; the head is injured; the right hand is mashed, with three fingers gone. It is unnecessary to further detail the injuries. It is sufficient that the grevious injuries to the body are for the duration of the appellee's life, and the mental anguish of such condition will continue with him during his lifetime. The law fixes the compensation, not only of money loss, presently and because of diminished capacity to labor in the future, but of mental anguish and physical suffering, presently and in the future. In view of this rule of damages and the entire absence of any circumstances tending to show improper action on the part of the jury rendering the verdict, this court does not feel justified in lessening the amount of compensation determined by the jury.

We think the judgment should be affirmed, and it is accordingly so ordered.